No. 25-4217

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STENSON TAMADDON, LLC,

*Plaintiff-Appellant,*

v.

UNITED STATES INTERNAL REVENUE SERVICE, UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF THE TREASURY,

*Defendants-Appellees.*

Appeal from the United States District Court for Arizona, Phoenix
Civil Case No. 2:24-01123-PHX-SPL (Hon. Stephen P. Logan)

**OPENING BRIEF FOR PLAINTIFF-APPELLANT**

Peter A. Arhangelsky
GREENBERG TRAURIG, LLP
2375 East Camelback Road, Suite 800
Phoenix, AZ 85016
Tele.: (602) 445-8000
Email: peter.arhangelsky@gtlaw.com
*Attorneys for Plaintiff-Appellant*
*Stenson Tamaddon, LLC*

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ................................ x

INTRODUCTION ..................................................................... 1

STATEMENT OF JURISDICTION ........................................... 3

STATEMENT OF THE ISSUES .............................................. 3

STATEMENT OF THE CASE ................................................. 4

    I.    Legal and Factual Background ................................... 4

        A. The Employee Retention Credit and Development of
           Notice 2021-20 ........................................................ 4

        B. The IRS's "Nominal Portion" and "10 Percent" Rules ........ 9

        C. Other Rules that Limit ERC Eligibility ............................ 14

        D. Record-Keeping Requirements ......................................... 17

        E. StenTam's Background ..................................................... 20

    II.    Procedural History ................................................... 21

SUMMARY OF ARGUMENT ................................................ 23

STANDARD OF REVIEW ..................................................... 24

ARGUMENT ........................................................................ 26

    I.    Notice 2021-20 Contains Legislative Rules ............... 26

        A. The Exceptions to APA Rulemaking Must Be
           Narrowly Construed ..................................................... 26

B. Notice 2021-20 Amends the Statutory Scheme, Imposes New Obligations, and Has the Force of Law ...... 28

    1. Notice 2021-20 Amends the Statutory Scheme ........... 31

        a. The 10 Percent Rule Amends Section 3134(c)(2)(A)(ii)(I) .................................................. 32

        b. Notice 2021-20 Amends the Law to Exclude Businesses That Were Indirectly Suspended ....... 38

        c. New Substantive Recordkeeping Obligations........ 40

    2. Notice 2021-20 Is Not a "Safe Harbor" ........................ 42

    3. The IRS Lacks a Statutory Basis to Enforce Its 10 Percent Rule Without Notice 2021-20 ........................ 46

    4. How the IRS Characterized Notice 2021-20 is Irrelevant............................................................................ 47

II. The IRS's Notice is Arbitrary and Capricious ......................... 49

III. The Notice is Inconsistent with Statutory Intent.................... 53

IV. Notice 2021-20 Must be Vacated............................................... 55

CONCLUSION ................................................................................. 57

STATEMENT OF RELATED CASES ................................................. 58

# TABLE OF AUTHORITIES

## Cases

*Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp.*, 517 F. Supp. 2d 391 (D.D.C. 2007) ...................................................................... 33

*Advanced Integrative Med. Sci. Inst., PLLC v. DEA*, 128 F.4th 1133 (9th Cir. 2025) ....................................................................... 52

*Alcaraz v. Block*, 746 F.2d 593 (9th Cir. 1984) ................................. 27, 30

*Am. Bus Ass'n v. United States*, 627 F.2d 525 (D.C. Cir. 1980) ............. 44

*Am. Librs. Ass'n v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) ............... 39

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) 30, 42, 44

*Arellano v. Benov*, 2014 WL 1271530 (E.D. Cal. Mar. 27, 2014)............ 45

*Avon Nursing & Rehab. v. Becerra*, 119 F.4th 286 (2d Cir. 2024) ......... 25

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020)........................................ 54

*Cath. Health Initiatives v. Sebelius*, 617 F.3d 490 (D.C. Cir. 2010) 36, 37, 38

*Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615 (4th Cir. 2018) ..................................................................... 40

*Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30 (D.D.C. 2020)................. 31

*Doe v. Trump*, 288 F. Supp. 3d 1045 (W.D. Wash. 2017) ................ 27, 30

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)....................... 30

*Faith Int'l Adoptions v. Pompeo*, 345 F. Supp. 3d 1314 (W.D. Wash. 2018) ................................................................. 48

*Gill v. United States Dep't of Justice*, 913 F.3d 1179 (9th Cir. 2019) ..... 29

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1 (D.C. Cir.) ................................................................. 30

*Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082 (9th Cir. 2003) ............................................................... passim

*Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165 (7th Cir. 1996) ........ 34, 35, 37

*Humane Soc. of U.S. v. Locke*, 626 F.3d 1040 (9th Cir. 2010) ............... 52

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 2017 WL 539578 (D. Or. Feb. 9, 2017) ............................................... 53

*Iowa League of Cities v. EPA*, 711 F.3d 844 (8th Cir. 2013) ................. 27

*L.A. Closeout, Inc. v. Dep't of Homeland Sec.*, 513 F.3d 940 (9th Cir. 2008) ................................................................. 29

*Lane v. Salazar*, 911 F.3d 942 (9th Cir. 2018) ...................................... 29

*League of California Cities v. FCC*, 118 F.4th 995 (9th Cir. 2024) ........ 49

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ..... 25, 53, 54

*Mann Constr., Inc. v. United States*, 27 F.4th 1138 (6th Cir. 2022) ...... 40

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) .......................... 31, 40

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95 (2d Cir. 2018) .................................................. 28, 31, 42

*Nat'l Educ. Ass'n v. DeVos*, 379 F. Supp. 3d 1001 (N.D. Cal. 2019) ....... 27

*Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 48 F.4th 1307 (Fed. Cir. 2022) ............................................................... 51

*Nat'l Res. Def. Council v. EPA*, 643 F.3d 311 (D.C. Cir. 2011) .............. 31

*North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008) ......................... 56

*North Carolina v. FERC*, 730 F.2d 790 (D.C. Cir. 1984) ....................... 56

*Paulsen v. Daniels*, 413 F.3d 999 (9th Cir. 2005) ................................... 27

*Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634 (D.C. Cir. 2020) ...... 49

*Reno-Sparks Indian Colony v. U.S. E.P.A.*, 336 F.3d 899 (9th Cir. 2003) ........................................................................................... 29, 48

*Russello v. United States*, 464 U.S. 16 (1983) ....................................... 54

*Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019) ........................... 49

*Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219 (9th Cir. 2015) .. 25

*Smalls v. England*, 41 F. App'x 989 (9th Cir.) ...................................... 25

*Texas v. Cardona*, 743 F. Supp. 3d 824 (N.D. Tex. 2024) ...................... 48

*Texas v. United States Env't Prot. Agency*, 389 F. Supp. 3d 497 (S.D. Tex. 2019) ......................................................................................... 26

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ....................... 30, 42

*Thomas v. CalPortland Co.*, 993 F.3d 1204 (9th Cir. 2021) ................... 25

*United States v. Alvarez-Gutierrez*, 394 F.3d 1241 (9th Cir. 2005) ........ 45

*United States v. Bert*, 292 F.3d 649 (9th Cir. 2002) ............................... 34

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Fed. Highway Admin.*, 151 F. Supp. 3d 76 (D.D.C. 2015) ................................................................... 35, 38

*Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv.*, 307 F.3d 1214 (9th Cir. 2002) .............................................................. 25

*Wood v. Betlach*, 2012 WL 4762466 (D. Ariz. Oct. 5, 2012) ................. 55

## Statutes

26 U.S.C. § 3134(c)(2)(A)(ii)(I) ......................................... passim

26 U.S.C. § 3134(c)(2)(A)(ii)(II) ................................. 7, 32, 37

26 U.S.C. § 3134(m) .......................................................... 7

26 U.S.C. § 6001 ....................................................... 17, 41

26 U.S.C. § 6676 ............................................................ 42

28 U.S.C. § 1291 ............................................................. 3

28 U.S.C. § 1331 ............................................................. 3

5 U.S.C. § 706(2)(A) .......................................... 3, 25, 49, 53

## Other Authorities

Ronald M. Levin, *Rulemaking and the Guidance Exemption*, 70 ADMIN. L. REV. 263 (2018)............................................................... 30

## Regulations

26 C.F.R. § 31.6001-1 ................................................... 17, 41

## Legislation

Pub. L. 116-136, 134 Stat. 281 (2020)................................................ 4, 6, 17

Pub. L. 116-260, 134 Stat. 1182 (Dec. 2020)............................................ 6

Pub. L. 117-2, 135 Stat. 4 (Mar. 2021)..................................................... 6

Pub. L. 117-58, 135 Stat. 429 (Nov. 2021) ............................................... 6

## STATEMENT REGARDING ORAL ARGUMENT

The Court should set oral argument. This appeal presents significant questions under the Administrative Procedure Act concerning the line between legislative and interpretive rules. The district court described the case as "a close call" and acknowledged the difficulty of distinguishing between those categories (1-ER-28). That recognition underscores the value of oral argument to aid in resolving issues that are both legally intricate and nationally significant.

The IRS's administration of the Employee Retention Credit affects hundreds of thousands of employers and billions of dollars in pandemic relief tax credits. The outcome of this case may have consequences beyond the parties, shaping how the IRS issues and enforces sub-regulatory guidance in future programs. Given the complexity and importance of the issues, oral argument will materially assist the Court.

## INTRODUCTION

This appeal challenges the district court's order upholding IRS Notice 2021-20, a 102-page guidance document issued to implement the Employee Retention Tax Credit ("ERC"). Under de novo review, the Court should reverse and vacate Notice 2021-20 because the IRS (1) issued binding legislative rules without notice and comment, (2) acted arbitrarily and capriciously by providing no contemporaneous explanation for new eligibility limits, and (3) imposed restrictions that conflict with the statute.

Congress enacted the ERC during the COVID-19 pandemic to help employers keep workers on payroll despite sweeping government restrictions. The statute created broad eligibility pathways and directed the IRS to administer the program. The IRS issued Notice 2021-20 in March 2021 to give guidance on the credit. But that Notice went beyond interpretation of the ERC statute. It introduced substantive, binding limits on ERC eligibility. These legislative rules were untethered to statutory text. And because they were promulgated without rulemaking under 5 U.S.C. § 553, they are unlawful under the APA. The IRS has never claimed that notice-and-comment procedures were impracticable. It simply chose to legislate through guidance instead.

Appellant Stenson Tamaddon, LLC ("StenTam") challenged the Notice under the APA as both procedurally and substantively unlawful. The district court nonetheless granted summary judgment to the IRS, holding that Notice 2021-20 was an interpretive rule exempt from § 553. While conceding this was "a close call" and that the legislative–interpretive line is "more art than science" (1-ER-20), the court nonetheless erred in treating the Notice as a set of optional "safe harbors." In practice, the IRS has enforced the Notice as binding law.

Notice 2021-20 unlawfully reshaped the ERC in ways the APA forbids. It converted an open-ended statutory standard into a rigid numerical cutoff, imposed new restrictions and recordkeeping obligations without explanation, and narrowed ERC eligibility through extra-textual exclusions. The agency provided no contemporaneous reasoning, no data, and no statutory basis for these choices, leaving "no identifiable factual evidence" in support of its rules. *See* 1-ER-26. Nor was the Notice a mere "safe harbor." IRS agents have denied ERC claims based on failure to comply with these substantive rules.

Congress intended the ERC to provide broad relief during an unprecedented economic crisis. By substituting its own restrictive

framework, the IRS contravened statutory text and legislative design. This Court should therefore reverse and vacate Notice 2021-20.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because this case arises under the Administrative Procedure Act. The district court entered final judgment on June 20, 2025. 1-ER-2–29. This Court has jurisdiction under 28 U.S.C. § 1291. StenTam filed a timely notice of appeal on July 8, 2025. 4-ER-678; Fed. R. App. P. 4.

## STATEMENT OF THE ISSUES

1.     Whether IRS Notice 2021-20 imposed legislative rules that required notice-and-comment rulemaking under 5 U.S.C. § 553.

2.     Whether the eligibility restrictions in Notice 2021-20 were arbitrary and capricious under the APA, 5 U.S.C. § 706(2)(A).

3.     Whether the eligibility restrictions in Notice 2021-20 exceeded the IRS's statutory authority and conflicted with Congress's intent in enacting the Employee Retention Credit.

# STATEMENT OF THE CASE

## I. Legal and Factual Background

### A. The Employee Retention Credit and Development of Notice 2021-20

The COVID-19 virus swept through all fifty states in 2020 and resulted in government orders that disrupted, or nearly halted, United States' local and national economies. 2-ER-189 (¶11). The ensuing government restrictions formed a nexus of federal, state, and local mandates that created a comprehensive regulatory scheme limiting commerce, travel, and group meetings. 2-ER-189 (¶12). A network of more than 4,200 orders at the state and local level limited most businesses and therefore threatened their ongoing existence. 2-ER-189-190 (¶¶12-13).

Congress enacted the ERC in the CARES Act of 2020. *See* Pub. L. 116-136, § 2301, 134 Stat. 281, 347 (2020). The ERC is a broad-based, refundable tax credit designed to stimulate economic recovery, support job retention, and mitigate impacts on small businesses from the unprecedented challenges during the pandemic. *See* 2-ER-187-188 (¶3). The ERC was enacted alongside other stimulus programs that paid cash outright to citizens with no strings attached. 2-ER-188 (¶4). That

included broad payouts like Economic Impact Payments (EIPs) made directly to eligible citizens. *Id.*

Congress has resorted to employee retention tax credits in other emergencies. 2-ER-191 (¶20). But the COVID-19 tax credit was substantially broader in recognition that stimulus money was needed to fend off catastrophic business losses nationwide. 2-ER-191 (¶¶20-22). From the outset, lawmakers emphasized the ERC's sweeping remedial purpose and directed the IRS to conduct outreach so businesses would take full advantage. 2-ER-188–192.[1]

Congress repeatedly expanded the ERC in subsequent amendments, broadening access and increasing the credit, including raising the percentage of qualified wages covered and permitting employers with PPP loans to participate. *Id.* The Congressional Budget Office initially projected the ERC would cost over $85 billion. 2-ER-188. Subsequent expansions signaled a deliberate choice to broaden eligibility. 2-ER-188. In short, the ERC was conceived as a widely

---

[1] Small businesses—constituting 99.9% of U.S. firms and employing 62 million workers—were intended beneficiaries of the ERC, yet fewer than ten percent ultimately claimed the credit. 2-ER-190.

accessible program to reach millions of small businesses, not as a tightly cabined tax expenditure subject to hidden thresholds.

The statute defined "eligible employer" to include any employer carrying on a trade or business during the relevant tax quarter that met one of several conditions. Congress codified this language at 26 U.S.C. § 3134(c)(2)(A):[2]

> **(2) Eligible employer.**--
>
> > **(A) In general.**--The term "eligible employer" means any employer--
> >
> > > **(i)** which was carrying on a trade or business during the calendar quarter for which the credit is determined under subsection (a), and
> > >
> > > **(ii)** with respect to any calendar quarter, for which--
> > >
> > > > **(I)** the operation of the trade or business described in clause (i) is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19),

---

[2] Although not every version of the ERC statute was codified in the United States Code, § 3134 reflects the final codification. For purposes relevant here, each prior enactment contained substantively equivalent provisions under the Government Orders Test in § 3134(c)(2)(A)(ii)(I). *See* CARES Act of 2020, Pub. L. 116-136, § 2301, 134 Stat. 281, 347 (Mar. 2020); *see also* Pub. L. 116-260, 134 Stat. 1182, 3062 (Dec. 2020); Pub. L. 117-2, § 9651, 135 Stat. 4, 176, 182 (Mar. 2021); Pub. L. 117-58, § 80604, 135 Stat. 429, 1341 (Nov. 2021).

**(II)** the gross receipts (within the meaning of section 448(c)) of such employer for such calendar quarter are less than 80 percent of the gross receipts of such employer for the same calendar quarter in calendar year 2019, or

**(III)** the employer is a recovery startup business[.]

Section (I) has become known as the Government Orders Test, a qualitative standard focused on disruptions caused by government restrictions. Section (II) is the Gross Receipts Test, a quantitative standard based on revenue declines. Section (II) qualified employers that suffered decreased gross revenues regardless of the circumstances. Congress included numerical thresholds only under the Gross Receipts Test. *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(I)-(II).

Although the CARES Act authorized the Secretary of the Treasury to issue forms, instructions, and guidance to facilitate the ERC, it did not exempt the IRS from the APA's notice-and-comment requirements. *See* 26 U.S.C. § 3134(m) (compelling the Secretary to issue "such forms, instructions, regulations, and other guidance"). Nor has the IRS ever argued that it qualified for the APA's "good cause" exception to rulemaking. *See* 5 U.S.C. § 553(b)(4); *see generally* 2-ER-187-207. Instead, the agency declined to promulgate regulations and published a series of "Frequently Asked Questions" beginning in April 2020 to

7

announce its plans for the ERC program. *See* 3-ER-363 (the IRS issued "other guidance" in lieu of regulations).

On March 1, 2021, nearly a full year after Congress passed the CARES Act, the IRS published a 102-page guidance document titled "Notice 2021-20," which presented the IRS's rules governing the ERC program in "Question and Answer" format. 3-ER-243-345 (Notice 2021-20). The stated purpose of Notice 2021-20 was to publish the IRS's standards for application of Section 2301 of the CARES Act, as amended by section 206 of the Relief Act. 2-ER-195 (¶45).

The IRS published Notice 2021-20 against the backdrop of growing confusion among taxpayers and practitioners. 1-ER-28 ("the IRS was under pressure to issue guidance"). At more than one hundred pages, the Notice was significant in scope for an agency "guidance" document, and it promptly became the reference point for examiners, practitioners, and taxpayers alike.

The IRS has since made clear that "Notice 2021-20 governs the ERC for all periods." 3-ER-364. In later guidance, the IRS described Notice 2021-20 as setting forth the "rules related to claiming the ERC,"

underscoring that IRS treated it as binding and authoritative rather than advisory. 2-ER-203–205 (collecting citations); *see also* 3-ER-434, 443, 449.

Among the many conditions and restrictions included in IRS's 102-page rule, Notice 2021-20 promulgated changes to the statutory framework under the government orders prong in Section 3134(c)(2)(A)(ii)(I).

## B. The IRS's "Nominal Portion" and "10 Percent" Rules

In Section D, Notice 2021-20 provided rules governing the "full or partial suspension of trade or business operations" that qualify for ERC. In Q&A No. 11, the IRS first explained that an employer is eligible "if, under the facts and circumstances, more than a nominal portion of its business operations are suspended by a governmental order." 3-ER-270. The Notice then defined "nominal portion" through the following standard:

> Solely for purposes of this employee retention credit, a portion of an employer's business operations will be deemed to constitute more than a nominal portion of its business if either (i) the gross receipts from that portion of the business operations is not less than 10 percent of the total gross receipts (both determined using the gross receipts of the same calendar quarter in 2019), or (ii) the hours of service performed by employees in that portion of the business is not less than 10 percent of the total number of hours of service performed by all employees in the employer's

9

> business (both determined using the number of hours of service performed by employees in the same calendar quarter in 2019).

*See* 3-ER-271.

Notice 2021-20 relied heavily on this rule, referencing it dozens of times throughout. *See, e.g.*, Q&A 17 (3-ER-277) ("the employer's operations would be considered to be partially suspended if, under the facts and circumstances, the operations that are closed are more than a nominal portion of its business operations and cannot be performed remotely in a comparable manner"); Q&A 18 (3-ER-282) ("The mere fact that an employer must make a modification to business operations due to a governmental order does not result in a partial suspension unless the modification has more than a nominal effect on the employer's business operations.").

Although the Notice stated that a "nominal portion" would be evaluated on the "facts and circumstances," it mandated that those circumstances must still meet the 10 Percent Rule:

> Whether a modification required by a government order has more than a nominal effect on the business operations is based on the facts and circumstances. A government order that results in a reduction in an employer's ability to provide goods or services in the normal course of the employer's business *of not less than* 10 percent will be

10

> deemed to have more than a nominal effect on the
> employer's business operations.

3-ER-282 (emphasis added). The binding nature of that requirement was
underscored by the IRS's Chief Counsel in an October 18, 2023
memorandum:

> If an employer maintains that modifications had more than
> a nominal effect on the employer's trade or business
> operations, the employer needs to substantiate that the
> modifications resulted in a reduction of the employer's
> ability to provide goods or services in the normal course of
> the employer's business of not less than 10 percent to fall
> within the provisions of Notice 2021-20.

3-ER-505; *see also* 2-ER-197 (¶¶53-54).

The 10 Percent Rule became the basis for IRS enforcement. The IRS
disallowed ERC claims specifically for failing that Rule where taxpayers
"did not substantiate how … modifications resulted in the Taxpayer's
reduction in their ability to provide services in the normal course of
business of not less than 10 percent to fall within the provisions of Notice
2021-20." 3-ER-396; *see also* 3-ER-371–372. IRS emphasized that "[t]o
the extent that legislation did not modify the original provisions of the
ERC, Notice 2021-20 governs the ERC for all periods." 3-ER-391.

IRS agents likewise informed StenTam and its clients that Notice
2021-20 was binding. In at least thirty-three examinations and audits,

11

agents stated that eligibility was determined through Notice 2021-20, including under the 10 Percent Rule. 2-ER-82–83 (Stenson Decl. ¶¶23–24). At one appeals conference, an IRS Appeals Officer and his manager explained:

> So I'm going to be looking at do you qualify. It is your burden to prove that you're entitled to the credit and I'm going to be considering pretty much your argument and whether you meet the statutory and rules that, you know, the requirements in the statute and, I believe, the – in Notice 2021-20.

*See* 2-ER-83 (Stenson Decl. at 6); *see also id.* ¶23 (unrebutted testimony that IRS denied ERC claims specifically because the business could not meet the 10 Percent Rule). In another denial, IRS explained that:

> [Taxpayer] had sufficient time to search through the [Notice 2021-20] to identify IRS's clarification of what constitutes 'more than a nominal effect' on business operations. Per Notice 2021-20, a government order that results in a reduction in an employer's ability to provide goods or services in the normal course … of not less than 10 percent will be deemed to have more than a nominal effect on the employer's business operations.

2-ER-102 (Denial Letter).

The IRS's "Frequently Asked Questions" webpages, which rely on Notice 2021-20, instruct taxpayers that the 10 Percent Rule governs whether a business is eligible:

12

Q5. What does "more than nominal" mean when considering whether my business or organization was partially suspended?

A5. IRS will consider you to be partially suspended if more than a nominal part of your business was suspended by a government order.

The IRS considers "more than nominal" to be *at least 10%* of your business based on either the gross receipts from that part of the business or the total hours your employees spent working in that part of the business.

If all parts of your business could operate but you had to modify how it operated, then *we will consider you to be partially suspended if you can show that the order had more than a nominal effect on your business.* We consider "more than a nominal effect" *to be at least a 10% reduction* in your ability to provide goods or services in the normal course of your business…

For more details and examples, see Notice 2021-20, Section III.D., Questions 11, 17 and 18.

*See* IRS, "Frequently asked questions about the Employee Retention Credit" (section regarding "Qualifying government orders") (emphasis added).[3]

---

[3] *Available at*, https://www.irs.gov/coronavirus/frequently-asked-questions-about-the-employee-retention-credit#qualifying (last accessed July 25, 2025) (cited 2-ER-66 n.7).

## C. Other Rules that Limit ERC Eligibility

The IRS's legislative efforts were not limited to the 10 Percent Rule. Notice 2021-20 also imposed a series of additional restrictions that narrowed ERC eligibility beyond the statutory text.

Q/A No. 12 created a supplier-disruption rule in the IRS's "partial suspension" analysis. 3-ER-271–272. That rule limits eligible supply chain disruptions to instances when the supplier is itself *directly* suspended by a government order, and where "the business's suppliers are unable to make deliveries of critical goods or materials due to a governmental order that causes the supplier to suspend its operations." *Id.* Employers whose operations were foreseeably disrupted by indirect supplier impacts, but whose suppliers were not physically closed by government orders, were excluded.

Q/A No. 13 excluded employers who suspended operations after a government order eliminated their customer base: "An employer that suspends some or all of its operations because its customers are subject to a government order requiring them to stay at home or otherwise causing a reduction in demand for its product or services is not considered to have a full or partial suspension of its operations due to a government

order." 3-ER-272–274. The IRS's example involved an automobile repair service that, although not required to close, lost its customer base because lockdown orders prevented access to the facility. *Id*. Despite government orders being the reason customers could not reach the business, the IRS deemed that employer ineligible.

Q/A No. 15 required employers to show they could not continue "comparable" operations even if suspended by a government order. 3-ER-274. The Notice explained:

> If an employer's workplace is closed by a governmental order, but the employer is able to continue operations comparable to its operations prior to the closure, including by requiring its employees to telework, the employer's operations are not considered to have been fully or partially suspended as a consequence of a governmental order.

3-ER-274–275. In other words, even if a government order forced closure, the IRS denied eligibility unless the employer could also prove that it was unable to maintain comparable operations through other forms of business.

Q/A No. 16 extended that restriction by setting factors employers must evaluate when determining whether they could continue "comparable operations." 3-ER-276–277. Those factors—none of which appear in the statute—require businesses to adopt telework procedures

15

where possible. *Id*. The Notice further declared that employers remain ineligible during any "adjustment period" spent implementing such changes. *See* 3-ER-277 ("some adjustment period is expected, and, generally, the employer's operations are not considered partially suspended during that period.").

The IRS provided four factors that must be considered. *Id*. at 276-277. Those factors then became the basis to evaluate and enforce the new "comparable operations" rule announced through Q/A No. 15. The IRS would (1) evaluate whether the employer had "adequate support (IT and otherwise) to continue operations remotely or through another location; (2) determine the amount of portable work that could be performed remotely; (3) "evaluate the role that the employer's physical work space plays in an employer's trade or business"; and (4) if an "adjustment period" would be required to transition into remote work, the IRS must then determine whether those delays are "significant" enough to become "a partial suspension during that transition period." *Id*.

Neither the CARES Act, nor any of its statutory amendments included reference to the "comparable operations" language that became a rule of eligibility in Notice 2021-20. *See generally* 26 U.S.C. § 3134; Pub.

16

L. 116-136, § 2301, 134 Stat. 281, 347. Congress did not require businesses to transition into remote working relationships as a condition of receiving the tax credit.

Q/A Nos. 17 and 18 reinforced the "nominal portion" requirement, providing factors that must "be taken into account in determining whether a modification required by a governmental order has more than a nominal effect on business operations[.]" 3-ER-282. Employers who failed to meet these standards were deemed ineligible. 3-ER-283.

### D. Record-Keeping Requirements

Notice 2021-20 also imposed new record-keeping requirements on taxpayers seeking to claim the ERC under the full or partial suspension test in Section 3134(c)(2)(A)(ii)(I).

The Internal Revenue Code and Treasury regulations generally require taxpayers to maintain records substantiating their tax submissions. *See* 26 U.S.C. § 6001; 26 C.F.R. § 31.6001-1. Section 6001 requires taxpayers to "keep such records, as the Secretary deems sufficient to show whether or not such person is liable for tax[.]" I.R.C. § 6001. The regulations similarly require taxpayers to "keep a complete and detailed record with respect to the tax, interest, addition to the tax,

additional amount, or assessable penalty to which the claim relates." 26 C.F.R. § 31.6001-1(c).

For the ERC credit, Notice 2021-20 set specific record-keeping requirements. *See* 3-ER-343 (Q&A 70). The IRS specified that "[a]n eligible employer will adequately substantiate eligibility for the employee retention credit if the employer creates and maintains records that include" information germane to the new rules announced in the Notice. *Id*. This included an obligation to keep "records the employer relied upon to determine whether more than a nominal portion of its operations were suspended due to a governmental order or whether a governmental order had more than a nominal effect on its business operations[.]" *Id*.

Because Notice 2021-20 defined "nominal portion" to mean either 10 percent of gross receipts or 10 percent of employee service hours, Q&A No. 70 effectively required taxpayers to compile and maintain records supporting those elements.

Many of StenTam's clients were small businesses that "did not maintain records or data on the number of hours their employees worked within certain segments of their businesses." 2-ER-81 (Stenson Decl. ¶17). "Those businesses had employees performing multiple roles within

18

their business and servicing different business segments, making it challenging for them to evaluate how many hours were committed to certain tasks." *Id*. As a result, the recordkeeping requirements imposed costs and obligations for those businesses to collect data necessary to satisfy the IRS's 10 Percent Rule. *Id*.

The IRS also applied these obligations retroactively. *Id*. ¶18. Notice 2021-20 was first published in March 2021, yet it required documentation for ERC claims reaching back into 2020 and early 2021 quarters—periods when many taxpayers had no systems in place to track the information IRS would later demand. *Id*.

StenTam explained that notice-and-comment rulemaking would have allowed affected businesses to raise these burdens in advance. *Id*. ¶19. The IRS itself has recognized the benefits of such procedures, stating:

> The best practice for agency rulemaking is the notice-and-comment process established by the Administrative Procedure Act (APA). This process allows the public to participate before any final rule becomes effective and ensures that all views are adequately considered. It also enables the public to apprise the government of relevant information that the government may not possess or to alert the government to consequences that it may not foresee.

2-ER-205 (¶94).

19

### E. StenTam's Background

StenTam is a tax advisory and technology firm that works with businesses to prepare and submit ERC claims. It "operates as a consultant under the ERC program by helping businesses file ERC claims," and it "is compensated from the proceeds of credits refunded to its clients." 1-ER-4-5. When "a claim is disallowed, StenTam does not receive compensation for its services on that submission." *Id.*; *see also* 1-ER-7-8.

As the court recognized, StenTam "has dedicated significant resources to ensuring compliance with all policy positions the IRS releases with respect to the ERC," and that it "must adjust its business practices to account for the new developments, which comes with considerable costs." 1-ER-4, 5.

Each time the agency applies its extra-statutory "rules" to narrow eligibility, that not only eliminates compensation StenTam would otherwise receive, but also requires StenTam to rework compliance systems, and devote additional resources to defending claims that should have been allowed under the statute. 2-ER-80-82 (Stenson Decl.). The

narrowing effect of Notice 2021-20 thus directly harmed StenTam's financial position and its ability to carry out business. 1-ER-8.

## II. Procedural History

On September 14, 2023, the IRS announced an indefinite moratorium on the processing of new ERC claims. 4-ER-642-645 (Complaint); 4-ER-662-665 (IRS Press Release). The moratorium suspended all IRS processing activity on new claims, including payment on valid claims.

On May 14, 2024, StenTam filed this action against the IRS and its officers in their official capacities. StenTam sought declaratory and injunctive relief related to (1) the IRS's promulgation and enforcement of Notice 2021-20 in violation of the APA, and (2) the IRS's nationwide moratorium on ERC processing. 4-ER-623-626, 646-654 (Complaint). StenTam alleged that the IRS's moratorium exceeded statutory authority and contradicted the agency's obligation to process refund claims within a reasonable time. 4-ER-654-659.

StenTam moved for a preliminary injunction seeking to lift the moratorium. The district court ruled that the IRS was statutorily obligated to process ERC claims, and that the agency had instead tried

to shape public policy surrounding the CARES Act in conflict with Congressional intent: "The record indicates that the moratorium has very possibly evolved from beyond a resource allocation tool and into a procedural smoke screen." 4-ER-599-600. But the court denied StenTam's motion. 4-ER-577. It found that StenTam raised "serious questions" on the merits but the equities did not favor preliminary relief. *Id*. StenTam later dismissed its moratorium-related claims after the IRS resumed ERC processing in the summer of 2024. The case continued on all remaining APA counts against Notice 2021-20.

On June 20, 2025, the district court granted summary judgment for the government on APA Counts I through III. 1-ER-2-29. The court held that Notice 2021-20 was merely an interpretive rule exempt from APA notice-and-comment requirements. 1-ER-10-22. The court acknowledged that this case presented "a close call" and conceded the "difficult legal task for any Court to parse the difference between legislative and interpretive rules," recognizing that "finding that line is more art than science." 1-ER-20, 28-29. But it nonetheless credited the IRS's position that the Notice set forth only "safe harbors" rather than binding

obligations, despite unrebutted evidence that IRS agents enforced Notice 2021-20 as controlling law. 1-ER-15-18, 27.

StenTam timely appealed on July 8, 2025. 4-ER-678.

## SUMMARY OF ARGUMENT

Notice 2021-20 did not simply interpret the ERC statute. It imposed new binding eligibility standards. Most notably, the IRS's "10 Percent Rule" grafted a quantitative threshold onto Section 3134(c)(2)(A)(ii)(I) where Congress had deliberately omitted that qualifier. The Notice created that as a minimum eligibility threshold, not as a permissive "safe harbor," and IRS agents enforced it as a binding limit on claims. Because a rule that amends statutory eligibility criteria and carries the force of law is legislative, it is subject to the APA's notice-and-comment requirements. This Court should reverse the district court's decision on that basis.

The Notice was also arbitrary and capricious. The agency promulgated new ERC rules without contemporaneous reasoning or factual support. The administrative record contains "no identifiable factual evidence" (1-ER-26) supporting these rules, no explanation for why the IRS adopted a 10 percent threshold, or how it chose among

23

alternatives. Under the APA, an agency must provide a reasoned basis for its decisions, yet the district court excused the absence of explanation on erroneous grounds that arbitrary decision-making is tolerated when an agency interprets a statute. ER-25–26. That rationale conflicts with basic APA principles. Agencies must give reasoned explanations for rules they adopt, and here the IRS fell short.

Finally, the Notice conflicted with congressional intent. Congress created three distinct eligibility pathways. Only the Gross Receipts Test included a quantitative threshold. By contrast, the Government Orders Test required a qualitative inquiry into the effect of pandemic restrictions on business operations. By engrafting a numerical "10 Percent Rule" into the Government Orders Test, the IRS rewrote the statutory criteria. Because these rules conflict with the statute and legislative intent, they violated 5 U.S.C. § 706(2).

For all these reasons, the judgment should be reversed and Notice 2021-20 set aside.

## STANDARD OF REVIEW

"Whether an agency rule is interpretive or legislative is a question of law reviewed de novo." *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1086 (9th Cir. 2003). Whether agency action was arbitrary

24

and capricious under 5 U.S.C. § 706(2)(A) is likewise reviewed de novo. *Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1223 (9th Cir. 2015). And the district court's grant of summary judgment upholding an agency decision is also reviewed de novo. *Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv.*, 307 F.3d 1214, 1218 (9th Cir. 2002).

In applying the APA standards, this Court "determine[s] for [itself] whether the agency's decision" was supported under the law. *Smalls v. England*, 41 F. App'x 989 (9th Cir.), *opinion withdrawn on denial of reh'g*, 50 F. App'x 379 (9th Cir. 2002). The Court must also decide independently whether the agency properly interpreted or applied statutory law. *See Thomas v. CalPortland Co.*, 993 F.3d 1204, 1208 (9th Cir. 2021) ("We review the Commission's interpretation of a statute de novo"). "Under *Loper Bright*, courts must 'exercise their independent judgment in deciding whether an agency has acted within its statutory authority, … and under the [APA] may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Avon Nursing & Rehab. v. Becerra*, 119 F.4th 286, 291 (2d Cir. 2024) (quoting *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024)).

Accordingly, every issue presented in this appeal is subject to de novo review.

## ARGUMENT

The Administrative Procedure Act distinguishes between "legislative" rules, which carry the force of law, and "interpretive" rules or policy statements, which do not. *See* 5 U.S.C. § 553(b). Interpretive rules and policy statements are exempt from notice-and-comment requirements, but legislative rules are not.

The district court's ruling turned on its conclusion that Notice 2021-20 was merely "interpretive." This brief therefore begins with that threshold issue. It then addresses why the IRS's rules were arbitrary and capricious, and why they exceeded the agency's statutory authority.

## I.  Notice 2021-20 Contains Legislative Rules

### A.  The Exceptions to APA Rulemaking Must Be Narrowly Construed

Notice and comment rulemaking procedures under Section 553 are essential for transparency and public participation. *See Texas v. United States Env't Prot. Agency*, 389 F. Supp. 3d 497, 503 (S.D. Tex. 2019) (notice-and-comment procedures are "hardly trivial," as they ensure fairness and create an adequate record). "[C]omplying with the notice and

26

comment provisions when required by the APA is not a matter of agency choice." *Nat'l Educ. Ass'n v. DeVos*, 379 F. Supp. 3d 1001, 1021 (N.D. Cal. 2019).

Because notice-and-comment is among the APA's core safeguards against bureaucratic overreach, exemptions are "narrowly construed and only reluctantly countenanced." *Doe v. Trump*, 288 F. Supp. 3d 1045, 1074 (W.D. Wash. 2017) (quoting *Alcaraz v. Block*, 746 F.2d 593, 611 (9th Cir. 1984)). Congress and courts have limited those exceptions to avoid "escape clauses … which an agency could utilize at its whim." *Alcaraz*, 746 F.2d at 612.

Agencies would otherwise evade accountability if the boundaries between legislative and interpretive rules are not carefully policed. *See Iowa League of Cities v. EPA*, 711 F.3d 844, 873 (8th Cir. 2013) (warning of "layer upon layer of guidance documents and interpretive memoranda" ossifying into binding rules). Narrow construction of Section 553(b)(4)'s exceptions is therefore critical to prevent agencies from "avoid[ing] judicial review through the tyranny of small decisions." *Id*.

"Interpretive" rules fall within an exception to rulemaking under Section 553(b). But the agency bears the burden to show that this

exception applies. *See Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 113–14 (2d Cir. 2018). In close cases, courts should therefore err on the side of requiring rulemaking. Yet the district court did the opposite. It conceded this case was "a close call" (ER-28) but resolved all doubts in favor of the IRS. The court also ignored the IRS's burden to justify avoidance of rulemaking and made no mention of the proper burdens on review. That was error.

Here, the agency has never argued that it qualified for the APA's "good cause" exception to avoid rulemaking. *See* 5 U.S.C. § 553(b)(4); 2-ER-153–186. It also did not argue that rulemaking was impractical. Instead, it unilaterally imposed binding rules through a guidance document without public notice or transparency. As shown below, that violated the APA.

## B. Notice 2021-20 Amends the Statutory Scheme, Imposes New Obligations, and Has the Force of Law

The district court evaluated Notice 2021-20 purely through the three factors derived from *Hemp Indus.*, 333 F.3d at 1085. *See* 1-ER-11-12, 22-23. Those "*Hemp* factors" look to whether: "(1) in the absence of the rule, there would not be an adequate legislative basis for enforcement action, (2) the agency has explicitly invoked its general legislative

28

authority, or (3) the rule effectively amends a prior legislative rule." *Hemp*, 333 F.3d at 1088. *Hemp* noted that these factors are "helpful framework[s]" for identifying legislative activity, but not necessarily an exclusive test. *Id.*

The Ninth Circuit has often decided whether agency action is legislative without invoking the specific *Hemp* factors. For example, in *Gill v. United States Dep't of Justice*, 913 F.3d 1179, 1186 (9th Cir. 2019), the court held that an agency directive was legislative because it deprived officials of discretion, explaining: "The critical factor … is the extent to which the challenged directive leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the announced policy in an individual case." *Id.* Likewise, in *Lane v. Salazar*, 911 F.3d 942, 949 (9th Cir. 2018), the court explained that a legislative rule arises where it creates "new law, rights, or obligations," without referencing *Hemp*. *See also L.A. Closeout, Inc. v. Dep't of Homeland Sec.*, 513 F.3d 940, 942 (9th Cir. 2008) (same); *Reno-Sparks Indian Colony v. U.S. E.P.A.*, 336 F.3d 899, 909 (9th Cir. 2003) (same).

Other courts agree that "the ultimate inquiry is whether the agency intended to speak with the force of law." *Guedes v. Bureau of Alcohol,*

*Tobacco, Firearms & Explosives*, 920 F.3d 1, 18 (D.C. Cir.) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 215 (2016)).

The *Hemp* factors are merely indicia of such legislative action. But they cannot be elevated into an exclusive test without undermining the command that exceptions to APA rulemaking be narrowly construed. *See Trump*, 288 F. Supp. 3d at 1074 (quoting *Alcaraz*, 746 F.2d at 612).

In short, a rule is legislative when the agency treats it as a binding norm. *See Texas v. United States*, 809 F.3d 134, 173–76 (5th Cir. 2015). Courts therefore look to whether the rule strips agency personnel of discretion, either on its face or in practice. *See* Ronald M. Levin, *Rulemaking and the Guidance Exemption*, 70 ADMIN. L. REV. 263, 291 (2018) (describing the "binding norm" test); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000) ("If an agency acts as if a document … is controlling in the field … then the agency's document is for all practical purposes 'binding'"). Notice 2021-20 is legislative under those guidelines. The district court therefore erred in its application of the *Hemp* factors. By treating those factors as an exclusive test, the district court set the burden on StenTam to show that Notice 2021-20 fits

within that exclusive framework. ER-12–24. That was legal error. *Nat. Res. Def. Council*, 894 F.3d at 113–14 (the agency bears the burden).

But the district court's misstep was also compounded by its failure to apply the *Hemp* factors correctly. Even assuming *Hemp* is an exclusive test, Notice 2021-20 is nonetheless legislative under those factors. The Notice effectively amended the ERC statute by adding requirements Congress never intended, and the agency gave it the force of law. The *Hemp* factors are now addressed below.

### 1. Notice 2021-20 Amends the Statutory Scheme

"[A] rule is legislative, and therefore must undergo notice and comment, when it change[s] the law[.]" *Ciox Health, LLC v. Azar*, 435 F. Supp. 3d 30, 66 (D.D.C. 2020) (quoting *Nat'l Res. Def. Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011)). "The court's inquiry in distinguishing legislative rules from interpretative rules is [therefore] whether the new rule effects a substantive regulatory change to the statutory or regulatory regime." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014) (internal quotation omitted).

The district court failed to correctly apply this analysis. 1-ER-23–24. It concluded that Notice 2021-20 had only a "practical binding effect"

31

but not a "legally binding effect" and, so, it did not amend the law. *Id.* That reasoning improperly overlooked evidence showing the IRS enforced the Notice's rules—including the 10 Percent Rule—as binding standards.

### a. The 10 Percent Rule Amends Section 3134(c)(2)(A)(ii)(I)

In Section 3134(c)(2)(A)(ii)(II), Congress included a quantitative threshold for ERC eligibility. Congress required that "gross receipts … of such employer for such calendar quarter [be] less than 80 percent of the gross receipts of such employer for the same calendar quarter in calendar year 2019[.]" *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(II). But Congress excluded that type of quantitative minimum under the "government orders" test in Section (I).

The legislature instead passed a broad, qualitative condition for reimbursement in Section (I). Congress required only that a business was "fully or partially suspended" by governmental orders that limited commerce, travel, or meetings. Through Notice 2021-20, the IRS grafted onto that statutory clause a numerical threshold, except with a lower floor at 10 percent. *Compare* Notice 2021-20 at Q&A 11 (ER-270-272), *with* 26 U.S.C. § 3134(c)(2)(A)(ii)(II). The IRS therefore substantively

changed the eligibility pathway in Section (I) into another gross receipts test. 3-ER-270–271; *see also* 2-ER-203–205.

The statute in Section (I) not only lacks a 10 percent quantitative qualifier, it also omits the "more than nominal" construct the Notice invents. By superimposing a baseline numerical threshold (and the "more than nominal" rubric that rides with it), the IRS substantively revised the statutory criteria.

Nowhere does Notice 2021-20 explain that this 10 percent threshold is optional, illustrative, or a safe harbor. The IRS repeats its "more than nominal" standard throughout the 100-page guidance and embeds that standard in the agency's eligibility and recordkeeping rules, making it foundational to ERC administration. 3-ER-270–271.

This numeric overlay is not interpretation. "To be interpretive the rule must … derive a proposition from an existing document whose meaning compels or logically justifies the proposition." *Ace Prop. & Cas. Ins. Co. v. Fed. Crop Ins. Corp.*, 517 F. Supp. 2d 391, 404 (D.D.C. 2007) ("The substance of the derived proposition must flow fairly from the substance of the existing document"). Nothing in Section (I)'s qualitative

language—"fully or partially suspended"— compels or even suggests a 10 percent line.

Adoption of inflexible numerical thresholds is a hallmark of legislative rulemaking. In *Hoctor*, the Department of Agriculture used an internal memorandum to direct enforcement of animal-housing regulations. *See Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165 (7th Cir. 1996).[4] The Animal Welfare Act authorized the Secretary to adopt standards for humane handling of animals. The agency then promulgated through notice-and-comment a general "structural strength" rule requiring facilities to be maintained to protect and contain animals. *Id.* at 167-68. The USDA's internal memo went further. *Id.* It instructed that all "dangerous animals" must be confined within a perimeter at least eight feet high. *See id.* at 168. The USDA argued that this standard was an "interpretive" rule that interpreted the general animal housing regulation. *Id.* But the court ruled that the eight-foot

---

[4] *Hoctor* has been cited favorably by the Ninth Circuit. *See, e.g.*, *United States v. Bert*, 292 F.3d 649, 652 (9th Cir. 2002) (explaining that "arbitrary quantitative determinations [are] a quintessentially legislative function").

mandate was instead a new legislative rule that required notice-and-comment procedures. *Id.* at 170.

The Seventh Circuit rejected the USDA's position because the eight-foot minimum was a "flat," inflexible cutoff that could not be reasoned from the text of the regulation. *Id.* at 170 ("A rule that turns on a number is likely to be arbitrary … [t]here is no way to reason to an eight-foot perimeter-fence rule as opposed to a seven-and-a-half foot fence"). *Hoctor* explains that, when agencies base rules on arbitrary numerical choices, they are legislating and must use notice-and-comment. *Id.*[5] Inflexible numerical standards will rarely qualify as "interpretations" of qualitative language. *See Hoctor*, 82 F.3d at 171 (there is "an empirical relation between interpretation and generality on the one hand, and legislation and specificity on the other.").

*Hoctor* is on all fours here. The IRS converted Section (I) into a quantitative cutoff (10 percent) that is "as flat as they come"—not a rebuttable presumption, not a factor, and not a case-by-case yardstick

---

[5] *See also United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Fed. Highway Admin.*, 151 F. Supp. 3d 76, 88 (D.D.C. 2015) ("numerical-based rules are susceptible to arbitrary selection and, when the agency arbitrarily selects a number, the agency engages in a legislative function").

tied to the statutory text. The result is legislative rulemaking under the APA.

The D.C. Circuit's decision in *Catholic Health Initiatives* reinforces the same point under analogous facts. *See Cath. Health Initiatives v. Sebelius*, 617 F.3d 490 (D.C. Cir. 2010). There, HHS's Provider Reimbursement Manual imposed a 10 percent limit on equity investments by certain offshore captive insurers. *Id.* at 491-492. The agency argued its rule was "interpretive." *Id.* at 492. The court disagreed, holding that the 10 percent ceiling did not stem from the statute or regulations and thus could not be interpretive. "The short of the matter is that there [was] no way an interpretation of 'reasonable costs' can produce the sort of detailed—and rigid—investment code set forth in [the HHS Manual]." *Id.* at 496. The court continued, "when an agency wants to state a principle 'in numerical terms,' terms that cannot be derived from a particular record, the agency is legislating and should act through rulemaking." *Id.* at 495. And with respect to a 10 percent line in particular, the court emphasized that "it is impossible to give a reasoned distinction between numbers just a hair on the OK side of the line and ones just a hair on the not-OK side." *Id.* at 496.

36

Those principles apply here. The fact that Congress set numerical values in Section 3134(c)(2)(A)(ii)(II) is a clear indication that such provisions are legislative in nature. The IRS's decision to insert a different number for a different pathway (10 percent under the Government Orders Test) is precisely the kind of numerical policy choice *Catholic Health* and *Hoctor* treat as legislative. *See Catholic Health*, 617 F.3d at 495). And just like in *Catholic Health*, where the agency claimed to interpret "reasonable costs," the IRS's similar attempt to numerically define "partial suspensions" is equally legislative.

The district court's effort to recast the 10 percent cutoff as a mere "safe harbor" cannot salvage it. Notice 2021-20 nowhere says that the standard is a "safe harbor," nowhere signals that the number is optional or flexible, and repeats the cutoff and its "more than nominal" gloss throughout. 3-ER-270–271; *see also* 2-ER-203–205. In any event, as *Hoctor* warns, post hoc attempts by agency litigators to "loosen up" a flat numerical rule are no substitute for the rule's text and operation. *See Hoctor*, 82 F.3d at 171. And here the IRS's suggestion that Notice 2021-20 was a "safe harbor" was an argument of convenience first presented in litigation.

Like the 10 percent rule in *Catholic Health*, the IRS did not connect the threshold for ERC eligibility to the text of Section 3134(c)(2)(A)(ii)(I). *See United Steel*, 151 F.Supp. at 88 (the agency said "nary a word about why 90 percent was chosen as the threshold value to mean 'predominantly.'"). The rule arbitrarily amends the statute, and therefore falls within the *Hemp* factors. For the same reasons explained in *Hoctor* and *Catholic Health*, the Court should find that Notice 2021-20 is also legislative and therefore unlawful without rulemaking.

### b. *Notice 2021-20 Amends the Law to Exclude Businesses That Were Indirectly Suspended*

The government orders test is just forty-nine words in the statute. Yet Notice 2021-20 produced more than one hundred pages of restrictions and qualifications—most with no anchor in the statutory text. These limitations materially change the pool of eligible employers. And they carry binding consequences where the IRS has given Notice 2021-20 the force of law. Here, again, these changes fall within the *Hemp* factors because they amend the law.

The statute provides eligibility for any employer whose operations were suspended "*due to* orders from an appropriate governmental authority limiting commerce[.]" 26 U.S.C. § 3134(c)(2)(A)(ii)(I) (emphasis

added). "The definition of commerce in the Supreme Court's decisions has been notably broad." *See, e.g.*, *Am. Librs. Ass'n v. Pataki*, 969 F. Supp. 160, 172 (S.D.N.Y. 1997). Here Notice 2021-20 amends the ERC statute in conflict with that broad reading.

Q&A No. 13 denied eligibility where an employer lost its customer base due to government restrictions. 3-ER-272-274. Q&A Nos. 15–16 went further, denying ERC where employers could continue "comparable operations" through telework or other means. 3-ER-274–277. The Notice did not consider employers suspended even where government orders prevented customers from accessing the business. The Notice imposed factors not in the statute—like requiring businesses to facilitate telework. The IRS makes no effort to explain how that premise flows from the statutory text in Section 3134(c)(2)(A)(ii)(I).

Collectively, these rules rewrite the Government Orders Test into a much narrower tax program, and compel businesses to prove that their operations could not be continued through the subjective "comparable" operations test. Congress chose broad language ("fully or partially suspended … due to orders … limiting commerce") that readily encompasses disruptions caused by customer immobility, government-

imposed supply-chain shortfalls, or costly adjustments to new working conditions that were caused by historically burdensome government restrictions.

These new conditions cannot be characterized as mere interpretation. "A rule is legislative if it supplements a statute." *Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615, 620 (4th Cir. 2018). Guidance documents are likewise legislative where they "do more than clarify or remind parties of preexisting duties"—where they instead "supplement the statute by imposing specific duties." *Mendoza*, 754 F.3d at 1022. That is precisely what Notice 2021-20 did here.

### c. New Substantive Recordkeeping Obligations

Agency action that imposes new obligations on regulated parties is legislative when it adds mandatory compliance burdens. *See Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022). In *Mann*, an IRS Notice was legislative action because it imposed reporting obligations on the regulated class. *Id.* The taxpayer "had no obligation to provide information … before the Notice." *Id.* The new reporting duty instead "sprang from the IRS's own Notice." *Id.*

Notice 2021-20 did the same. It required employers claiming the ERC under the government orders test to "create and maintain records" on whether more than a "nominal portion" of operations was suspended. 3-ER-343–344. Because the Notice defines "nominal portion" through the 10 Percent Rule, those recordkeeping duties necessarily require taxpayers to generate records proving compliance with the invented threshold.

The IRS did not dispute that employers faced recordkeeping obligations under Notice 2021-20. Instead, it argued that such duties merely "track existing statutory and regulatory recordkeeping requirements." 1-ER-19 (citing 26 U.S.C. § 6001; 26 C.F.R. § 31.6001-1). But that reasoning overlooked the distinction between the general duty of substantiation and specific record-creation requirements in Notice 2021-20.

Section 6001 provides only that the IRS may require returns or records "as the Secretary deems sufficient." 26 U.S.C. § 6001. The regulation at Section 31.6001-1 likewise speaks in general terms. Neither authority requires employers to create data segregating employee hours

41

across different business segments. Those obligations spring exclusively from Notice 2021-20.

As in *Mann Construction*, taxpayers had no obligation to maintain such records before the Notice. The IRS's attempt to fold those new duties under general substantiation requirements is unavailing. The specific recordkeeping mandates exist here only because Notice 2021-20 imposed them, and a failure to comply exposes taxpayers to penalties. *See* 26 U.S.C. § 6676.

Thus, by setting substantive recordkeeping obligations tethered to its new eligibility rules, Notice 2021-20 amended or substantively changed the legal landscape for purposes of the *Hemp* analysis.

## 2. Notice 2021-20 Is Not a "Safe Harbor"

A legislative rule has legal effect or purports to speak with the "force of law." *Nat. Res. Def. Council*, 955 F.3d at 83. A telltale sign of legislative activity is where the rule removes discretion from agency actors. If an agency treats its proposal as a binding requirement, then it hardens into law and is presumptively subject to notice-and-comment. *See Texas*, 809 F.3d at 173–176; *Appalachian Power Co. v. EPA*, 208 F.3d

1015, 1021 (D.C. Cir. 2000) (an agency "Guidance" that gave "marching orders" was binding).

The IRS gave its rules in Notice 2021-20 the force of law by deeming them binding in adjudicative proceedings, other guidance documents, legal memoranda, and official agency practice, as explained in more detail above.

The IRS resists this conclusion by claiming that its 10 Percent Rule was merely a "safe harbor." For the first time only in litigation, the IRS argued that taxpayers could still qualify for ERC under unspecified "facts and circumstances" without meeting the 10 percent threshold. The district court credited that reasoning wholesale, holding that: "the IRS provided that number as a safe harbor while still allowing the possibility for eligibility for those whose percentage might be less under the facts and circumstances." 1-ER-18. That conclusion came from arguments of counsel, not on the text of the Notice, and not from the record.

The court failed to find evidence that the IRS treated the rule as a safe harbor. The administrative record instead showed that the IRS enforced its 10 Percent Rule as a binding norm and rule of eligibility. *See, e.g.*, 3-ER-396 (Form 886-A disallowing ERC claim specifically because

the taxpayer did not meet the 10 Percent Rule). But the district court's reasoning effectively concedes that if the rule is not a "safe harbor," then it is a binding norm and therefore legislative.

Legal memoranda from IRS's Office of Chief Counsel discuss Notice 2021-20 as the operative "law" alongside statutory text and Treasury regulations. 2-ER-197 (¶54); 3-ER-487–490. IRS counsel likewise declared that ERC eligibility depends on whether a business "fall[s] within the provisions of Notice 2021-20."[6] The IRS also denies taxpayer ERC claims that fail to meet the new rules.[7] These records show the IRS understood and applied the Notice as binding law, not optional guidance. *See Am. Bus Ass'n v. United States*, 627 F.2d 525, 531-32 (D.C. Cir. 1980) (an agency statement was "in reality a flat rule of eligibility"); *Appalachian Power*, 208 F.3d at 1023 (guidance that gave "marching orders" was binding).

The Notice's text also underscores its binding effect and therefore conflicts with the district court's opinion. It provides that an employer "may be considered to have a partial suspension of operations if, under

---

[6] *See* 3-ER-396; 2-ER-197–198 (¶¶55–56); 3-ER-505 (IRS GLAM 2023-007).

[7] *See* 2-ER-83; 2-ER-102; 3-ER-396; 3-ER-371-377.

the facts and circumstances, more than a nominal portion of its business operations are suspended by a governmental order." 3-ER-270. But the Notice also defines "nominal portion" to mean "*not less than*" 10 percent of receipts or employee hours. *Id*. at 271. By defining what "nominal portion" is, the agency necessarily states what it is not. *See United States v. Alvarez-Gutierrez*, 394 F.3d 1241, 1244–45 (9th Cir. 2005) ("[a] definition which declares what a term 'means' … excludes any meaning that is not stated") (internal quotation omitted); *Arellano v. Benov*, 2014 WL 1271530, at *13 (E.D. Cal. Mar. 27, 2014).

Other sections of the Notice confirm that 10 percent is the minimum threshold. *See* 3-ER-282 ("A governmental order that results in a reduction … *of not less than* 10 percent will be deemed to have more than a nominal effect" (emphasis added)). Nothing suggests that disruptions below 10 percent could ever qualify.

The district court seized on the Notice's reference to "facts and circumstances," reasoning that the IRS might still approve ERC outside the 10 Percent Rule. *See* 1-ER-16. But that reading is untenable. Because the Notice defines "nominal portion" in numerical terms, it is properly read to mean that an employer may qualify only if, under the "facts and

circumstances," the business meets the 10 percent rule. The "facts and circumstances" inquiry refers to how an employer demonstrates compliance with the threshold, not whether some alternative metric could apply.

Every indication in the record shows that the IRS intended Notice 2021-20 to supply the substantive "rules" of ERC eligibility. IRS agents applied those rules to disallow claims (2-ER-80–83), and the IRS has identified no instance where a claim was approved below the 10 percent cutoff. Nothing in the record supports the district court's "safe harbor" gloss. Notice 2021-20 is therefore legislative because the IRS gave it the "force of law."

### 3. The IRS Lacks a Statutory Basis to Enforce Its 10 Percent Rule Without Notice 2021-20

The Court may also look to whether, "in the absence of the rule, there would not be an adequate legislative basis for enforcement action." *Hemp Indus.*, 333 F.3d at 1085. Here the rules are not derived from statutory language. Thus, without Notice 2021-20, the IRS would have no grounds to deny ERC claims on the theory that a suspension must reduce business by at least 10 percent.

The district court never confronted that question directly. Instead, it sidestepped this *Hemp* factor by again accepting the IRS's characterization of Notice 2021-20 as a "safe harbor." 1-ER-15–16. That analysis was factually mistaken, as explained above, but also legally irrelevant.

Even "safe harbors" can be legislative where they govern taxpayer eligibility for the ERC. Those rules unlock eligibility for certain claimants and segregate favorable from unfavorable claims. The IRS is not free to disregard the APA when setting and then enforcing those parameters. It is therefore unclear why the district court's "safe harbor" analysis could govern outcome under this factor. Even if the rule was a safe harbor (it is not), the proper question under this *Hemp* factor is whether the agency could have enforced it without the Notice in place. It plainly could not. This factor therefore reflects a legislative rule.

### 4. How the IRS Characterized Notice 2021-20 is Irrelevant

The *Hemp* factors consider whether the agency "explicitly invoke[s] its general legislative authority." *Hemp Indus.*, 333 F.3d at 1087. That factor is of little consequence here. While invocation of legislative

authority is a clear sign of substantive rulemaking, the inverse does not hold: an agency cannot transform a legislative rule into an interpretive one by labeling it "guidance."

"Couching a substantive rule in an interpretive context does not automatically make it an interpretive rule." *Faith Int'l Adoptions v. Pompeo*, 345 F. Supp. 3d 1314, 1328 (W.D. Wash. 2018). "[A]gencies have never been able to avoid notice and comment simply by mislabeling their substantive pronouncements." *Texas v. Cardona*, 743 F. Supp. 3d 824, 889 (N.D. Tex. 2024). Courts "have long looked to the contents of the agency's action, not the agency's self-serving label, when deciding whether statutory notice and comment demands apply." *Id*. Courts should be "mindful but suspicious" of the agency's characterization, and must "focus primarily on whether the rule had binding effect on agency discretion or severely restricts it." *Reno-Sparks Indian Colony*, 336 F.3d at 909.

Accordingly, the IRS's decision to call Notice 2021-20 a "guidance" is irrelevant. What matters is not the label but the Notice's substantive effect. Here it created binding norms enforced against taxpayers.

## II. The IRS's Notice is Arbitrary and Capricious

"Even if a regulation is a permissible interpretive rule, [the court] may still strike the rule down under the APA's arbitrary-and-capricious standard, which requires that agency action be reasonable and reasonably explained." *League of California Cities v. FCC*, 118 F.4th 995, 1013–14 (9th Cir. 2024) (internal quotes omitted). The APA's standards in Section 706(2)(A) are not limited to formal rulemaking—there is no exception for interpretive rules. *See, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 365 (E.D.N.Y. 2019) (the APA requires reasoned explanation for both legislative and interpretive rules).

"For the action to be 'reasonable and reasonably explained,' the agency must have articulated a rational connection between the facts found and the choice made." *Id.* (internal citation omitted). Moreover, "[i]t is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Id.* at 1014. It is therefore "axiomatic that the APA requires an agency to explain its basis for a decision." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020).

49

The district court's opinion cannot be reconciled with those standards. The district court admitted that the IRS produced "no identifiable factual evidence" to justify the standards in Notice 2021-20. *See* 1-ER-26 ("this Court would be hard-pressed to find how the Notice in any way ran 'counter to the evidence before the agency' where there was no identifiable factual evidence to consider …"). It nonetheless excused the agency's complete failure to provide explanation for its rules. *See* 1-ER-26. But the APA does not permit an agency to immunize itself from review by choosing arbitrary standards without creating a record or articulating reasons. Upholding the district court's approach would encourage agencies to bypass the APA and issue rules based on whim and caprice—as the IRS did here.

The 10 Percent Rule exemplifies the problem. The IRS created that cutoff out of whole cloth. It never explained why a percentage test was necessary to administer Section 3134(c)(2)(A)(ii)(I), why 10 percent was the correct figure, or why other approaches were rejected. The agency offered no analysis, data, or findings—just a number. The district court justified its deference by noting that the IRS had received "multiple inquiry letter[s] … regarding these very issues." ER-27 (citing 4-ER-667-

673 and 4-ER-674-677). But those industry letters merely asked the IRS to provide guidance; none justified the 10 Percent Rule the agency ultimately imposed, or explained why the IRS took certain positions. *See* 4-ER-667-673 (AICPA Letter); 4-ER-674-677 (Ivins Phillips Letter). The letters do not substitute for reasoned decision-making.

When confronting the 10 Percent Rule under the APA standard, the district court yet again retreated to its mistaken "safe harbor" holding. 1-ER-27. But whether labeled a safe harbor or not, the APA still requires reasoned explanation for agency action. *See Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 48 F.4th 1307, 1313 (Fed. Cir. 2022) (agency guidance reviewed for arbitrariness under APA). The 10 Percent Rule is consequential. It grants automatic eligibility to tens of thousands of businesses above the line. Such a line cannot be imposed without explanation.

The district court acknowledged the arbitrary nature of this cutoff, admitting that "any classification based on a percentage or amount is necessarily somewhat arbitrary." 1-ER-27. But the APA does not tolerate arbitrariness simply because numbers are involved. And agencies must justify policy choices with evidence and reasoning. Here, the IRS

51

provided none. Nor did it justify any of the other rules discussed above. On this record, the agency's choice was pure ipse dixit.

The district court compounded the error by excusing the absence of explanation as if judicial review required substituting the court's "political will" for that of the agency. 1-ER-27. That misstates the purpose of the APA. Judicial review does not inject politics; it ensures agencies fulfill their statutory duty to provide a reasoned basis for their actions. StenTam never asked the court to opine on the political merits of the IRS's chosen course.

When a final agency action is challenged under the APA, the reviewing court must evaluate the reasons the agency actually gave, not post hoc rationalizations. *Advanced Integrative Med. Sci. Inst., PLLC v. DEA*, 128 F.4th 1133, 1143 (9th Cir. 2025). "The reviewing court should not attempt itself to make up for an agency's deficiencies: [it] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1048 (9th Cir. 2010). Here, all the district court had before it were arguments of IRS counsel, not an agency explanation grounded in the record. The court

nevertheless upheld Notice 2021-20 on those arguments alone. That was legal error.

## III. The Notice is Inconsistent with Statutory Intent

An agency must give effect to congressional intent when implementing a statute, and it is the courts—not the agency—that decide whether administrative rules align with statutory law. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). Whether styled legislative or interpretive, Notice 2021-20 is inconsistent with statutory intent. It therefore violates 5 U.S.C. § 706(2)(A) and (C).

By choosing to include one ERC prong with a quantitative measure and another without, Congress made a deliberate choice not to impose a numerical condition under the Government Orders Test. The IRS's creation of a 10 Percent Rule thus added an eligibility restriction Congress intentionally omitted.

The canon of *expressio unius est exclusio alterius* directs that where Congress lists particular conditions in one provision but not in another, the omission is presumed intentional. *See, e.g.*, *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 2017 WL 539578, at *18 (D. Or. Feb. 9, 2017) (applying *Russello*, 464 U.S. at 23). As the Supreme Court has

emphasized, "[w]here Congress includes particular language in one section of a statute but omits it in another … it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983).

Had Congress intended a "lite" version of the Gross Receipts Test under Section (I), it would have said so. By nevertheless creating its own numerical threshold, the IRS contravened statutory structure, violated interpretive canons, and acted beyond its authority.

The IRS's narrow reading of the Government Orders Test also clashes with Congress's policy goals. Congress designed the ERC to pay "eligible employers" using deliberately broad language: any business "fully or partially suspended" due to orders limiting "commerce, travel, or group meetings" for any purpose. Congress did not condition eligibility on the degree of a partial suspension. By narrowing the scope of qualifying disruptions, the IRS rebalanced Congress's stimulus program in a way that undermines its purpose.

The plain meaning of the statutory text supports that broader reading. When statutory terms are undefined, courts apply their ordinary public meaning. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020).

"Partially" means "to some extent" or "in some degree."[8] "Operation" of a business means its "method or manner of functioning."[9] Thus, an employer that had its operations suspended "to some extent" falls within Section 3134(c)(2)(A)(ii)(I). And the statute therefore extends ERC eligibility to businesses whose "method or manner of functioning" was suspended "to some extent" by a government order. As explained above, Notice 2021-20 categorically excluded employers whose operations were impacted enough under these broad constructs.

The IRS replaced Congress's broad eligibility standard with a narrow regulatory model that significantly reduced the number of eligible employers. Because nothing in the statute authorizes that substitution, the Notice therefore violates 5 U.S.C. § 706(2).

## IV. Notice 2021-20 Must be Vacated

"Courts may set aside part of an agency action only if it is severable from the rest of the agency's action." *Wood v. Betlach*, 2012 WL 4762466, at *4 (D. Ariz. Oct. 5, 2012). "[W]here there is substantial doubt that the agency would have adopted the same disposition regarding the

---

[8] *See* https://www.merriam-webster.com/dictionary/partially.
[9] *See* https://www.merriam-webster.com/dictionary/operation.

unchallenged portion if the challenged portion were subtracted, partial affirmance is improper." *Id.* (quoting *North Carolina v. FERC*, 730 F.2d 790, 795–96 (D.C. Cir. 1984)); *see also North Carolina v. EPA*, 531 F.3d 896, 929 (D.C. Cir. 2008) (vacating EPA's Clean Air Interstate Rule in its entirety, even though only discrete portions were challenged).

"Ordinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid." *Alameda Health Sys. v. Ctrs. for Medicare & Medicaid Servs.*, 287 F. Supp. 3d 896, 919 (N.D. Cal. 2017) (holding that "because CMS failed to engage in notice-and-comment rulemaking, the challenged provision must be set aside").

Appellants asked the district court to set aside Notice 2021-20. The errors are not isolated—they are pervasive and inextricable from the document as a whole. Provisions like the 10 Percent Rule, the "nominal portion" standard, and the "comparable operations" test appear more than fifty times throughout the Notice. *See generally* 3-ER-243–345. They dictate not only eligibility but also recordkeeping duties. *See* 3-ER-344–345. If those rules were removed, the remaining text would be incoherent. The Notice would not function as intended without them.

Thus, to provide meaningful relief, the Court must vacate Notice 2021-20 in its entirety.

## CONCLUSION

The judgment should be reversed. Notice 2021-20 must be vacated because it was issued in violation of the APA.

Dated: September 17, 2025.

Respectfully submitted,

**GREENBERG TRAURIG LLP**

By: ___/s/ Peter Arhangelsky___
Peter A. Arhangelsky
*Attorneys for Plaintiff-Appellant*
*Stenson Tamaddon, LLC*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, the undersigned attorney states as follows:  This appeal challenges the IRS's rules implementing the Employee Retention Tax Credit. Appellant Stenson Tamaddon, LLC is also an appellant in *ERC Today, LLC, et al. v. McInelly, et al.*, No. 25-3642 (9th Cir.), a case that challenges a different facet of the IRS's administration of the ERC program.

DATED: September 17, 2025 /s/ Peter Arhangelsky
Peter Arhangelsky

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-4217

I am the attorney or self-represented party.

**This brief contains** 10,681 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  [ ] it is a joint brief submitted by separately represented parties.
  [ ] a party or parties are filing a single brief in response to multiple briefs.
  [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Peter Arhangelsky **Date** 09/17/2028

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                    *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the Appellant's Opening Brief to be filed using the Court's CM/ECF system on September 17, 2025. All counsel to parties to the case are ECF users.

/s/ Peter Arhangelsky

September 17, 2025